## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **IVAN HERNANDEZ, ROBERTO RODRIGUEZ, BILL JONES, GENE MICHNO, MARVIN BAILEY, and RICHARD DAVIS,** | ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **Judge Ronald A. Guzmán** |
| | ) | **07 C 855** |
| **COOK COUNTY SHERIFF'S OFFICE, MICHAEL F. SHEAHAN, TIMOTHY KAUFMAN, SCOTT KURTOVICH, DENNIS ANDREWS, THOMAS SNOOKS, and THE COUNTY OF COOK,** | ) ) ) ) ) ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION AND ORDER

Ivan Hernandez, Roberto Rodriguez, Bill Jones, Gene Michno, Marvin Bailey and

Richard Davis have sued the Cook County Sheriff's Office, Michael F. Sheahan, Timothy

Kaufman, Scott Kurtovich, Dennis Andrews, Thomas Snooks and the County of Cook for

political retaliation in violation of the First Amendment pursuant to 42 U.S.C. § 1983, as well as

for intentional infliction of emotional distress and false imprisonment in violation of state law.

Defendants have renewed their motion for summary judgment based on qualified immunity.[1]

For the reasons set forth below, the Court denies the motion.

---

[1]The renewed summary judgment motion was prompted by the Seventh Circuit's opinion that reversed this Court's ruling that defendants had waived the issue of qualified immunity on summary judgment. Defendants' original qualified immunity analysis was, in its entirety:

> Applying the *Anderson* standard to the case at bar, Plaintiffs name all of the Defendants in their individual capacities. A reasonable official would not have known that by investigating the escape of six dangerous inmates and the potential criminal or negligent involvement of correctional officers would violate any constitutional right. The investigation was done in a lawful manner and was reasonable in relation to the specific facts confronting the public official at the time they acted.

**LR 56.1**

As stated in the Court's previous ruling on September 29, 2009, defendants have failed to comply with Local Rule 56.1 by citing to an entire exhibit in support of a fact statement. For example, defendants cite Exhibits 13 and 14 in their entirety, which are comprised of 1,500 and 220 pages respectively. Although the Court granted defendants leave to file new LR 56.1 submissions after the case was remanded to allow them to cure any defects in their previous submissions, they opted instead to rely on their previously filed LR 56.1(a) Statement. Thus, the Court has stricken paragraphs 7, 8, 25, 34, 40, 42-46, 59, 60 and the second sentences of paragraphs 15 and 35 from defendants' LR 56.1(a)(3) Statement. Defendants also cite Exhibit 16 in its entirety, which consists of Assistant State's Attorney Bonnie Greenstein's affidavit and interview notes. Because Exhibit 16 contains merely eight pages, the Court finds the citation sufficiently specific to meet the requirements of LR 56.1(a)(3) and has not stricken the related statements of fact. Further, where defendants cite an affidavit together with an accurate page number in support of a fact statement (*see, e.g.*, Def.'s LR 56.1(a)(3) Stmt. ¶ 6), the Court holds that such citations are sufficiently specific.

The Court has denied in part and stricken as moot in part defendants' motion to strike plaintiffs' statement of additional facts. First, the Court found plaintiffs' fact statements sufficiently succinct to enable defendants to respond. Second, the Court denied the motion to the extent that it sought to strike the plaintiffs' recitation of the Cook County Sheriff Merit Commission's conclusion that Davis did not desert his post in violation of orders, rules and regulations because plaintiffs do not argue that this Court is bound by the Commission's finding or conclusion and argue that such evidence merely sheds light on whether a reasonable person

would have known that Davis was suspended, de-deputized, transferred and terminated based on political retaliation and that he had not violated orders, rules and regulations. (*See* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 71.)[2] Third, the Court has stricken as moot in part the motion to the extent that it asked the Court to determine whether certain fact statements are based on hearsay because such determinations are made by the Court in the normal course of ruling on a summary judgment motion without prompting by the parties.

As it had with defendants, the Court granted plaintiffs leave to file LR 56.1 submissions in response to defendants' renewed motion on remand. Plaintiffs filed a supplemental statement of facts on the issue of qualified immunity to which defendants failed to respond. Thus, to the extent that plaintiffs' supplemental statement of facts is supported by citations and to the extent that those statement of facts were neither included in plaintiffs' original statement of additional facts nor originally disputed by defendants, those statements are deemed admitted.

**Facts**

Unless otherwise noted, the following facts are undisputed. The Cook County Sheriff's Office provides a jail as well as law enforcement in Cook County, Illinois. (Defs.' LR56.1(a)(3) Stmt. ¶ 2.) Plaintiffs were employed by the Cook County Sheriff as sworn correctional officers, specifically assigned to the Special Operations Response Team ("SORT"). (*Id.* ¶ 1.) The SORT officers were responsible for escorting high-risk detainees and responding to emergency situations. (*Id.*) Although defendants failed to include in their fact statement a description of the

---

[2]Although defendants also cite paragraphs 72-79 in support of their argument, they appear to have done so mistakenly because the fact statements contained therein are clearly not conclusions of law, but relate to plaintiffs' mental health treatment.

defendants as parties as required by LR 56.1(a)(3)(A), it may be reasonably inferred from the parties' statement of facts that defendants are all members of the same entity, the Cook County Sheriff's Office.

Between 2:00 p.m. and 10:00 p.m. on February 11, 2006, Captain Wright received a tip from a Chicago Police Officer that Abnormal Behavior Observation ("ABO") Unit inmate Michael McIntosh might possibly have a shank and called someone in the ABO Unit regarding the tip. (Defs.' Ex. 13, Augustyniak Aff. Exs., QH02920-QH02921; *see* Defs.' LR 56.1(a)(3) Stmt. ¶ 37.) In the late evening on February 11, 2006, six detainees escaped from the ABO Unit in Division 1 at the Cook County Department of Corrections ("CCDOC"). (*Id.* ¶ 6 (citing Ex. 13, Augustyniak Aff. Exs., QH 2741.) SORT Officer Darin Gater, who is not a plaintiff in this case, was on duty, and after the escape, he was found handcuffed in his underwear and t-shirt with blood coming out of his mouth in cell 14 of the ABO Tier. (*Id.* ¶ 10.)

Two investigations ensued regarding the escape, including a criminal investigation by the Cook County Sheriff's Police Department ("CCSPD") ("CCSPD investigation") and an investigation into violations of the CCDOC's administrative orders, rules and policies by the Internal Affairs Division ("IAD") of the CCDOC ("IAD investigation"). (*Id.* ¶ 6.) The Cook County State's Attorneys Office Felony Review Unit was present to review the circumstances that surrounded the escape. (*Id.* ¶ 9.) CCSPD and IAD interviewed correctional officers and inmates regarding the escape. (*Id.* ¶¶ 15, 35 (first sentence).)

Prior to the start of any investigation, defendant Director of Internal Affairs Timothy Kaufman appeared in the part of the jail from which the inmates escaped screaming, "this smells of Remus," "this is a Remus set up," "these f***ing jail guards," "you f***ing jail guards, you'll

pay for this," "you SORT guys are going to pay for this," "this smells like Remus' sh**."  (*Id.* ¶ 63; Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 3; Defs.' Ex. 7, Bailey Dep. at 84-85 (stating that Andrews was present during Kaufman's statements).)  At the time, Richard Remus, who once oversaw SORT and had the support of SORT officers, was running against Tom Dart, whom Sheahan endorsed, for the Democratic nomination for Cook County Sheriff.  (Defs.' Ex. 8, Sheahan Dep. at 264, 266-78; Defs.' Ex. 5, Davis Dep. at 147.)  At that point, Kaufman immediately met with the investigators, the state's attorneys and Kurtovich in a room.  (Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 63.)  Afterwards, Kaufman then met with Kurtovich, Andrews and Sheahan for five to six hours in an office after the escape.  (*Id.* ¶ 69.)

It is undisputed that after the escape, SORT Correctional Officer Darin Gater, who was on duty during the escape, was detained and interviewed intermittently by Cook County Sheriff's investigators, who are not defendants in this case, from approximately the time of the escape until he was charged and appeared in bond court on Wednesday, February 15, 2006.  (Pl.'s Supplemental LR 56.1(b)(3)(C) Stmt. ¶¶ 1-2.)  It is disputed whether Gater stated to the investigators and Assistant State's Attorney ("ASA") Bonnie Greenspan that he refused to sign any statement implicating Rodriguez, Jones, Michno, Davis and Bailey in the escape and referring to the escape as politically motivated to embarrass the Cook County Sheriff's Office so that Remus would be elected because it was a lie.  (*Id.* ¶ 10.)  The parties also dispute whether Gater signed the statement at some time after 7:00 p.m. on Monday, February 13, 2006 because he was threatened by the investigators and Greenspan that if he did not sign it, the charges would be changed so that Gater would face a fifteen-year jail term.  (*Id.* ¶ 14.)

Prior to Gater's signing the statement, the investigators questioned Rodriguez, Jones and

Davis about the escape and asked them what their political affiliation was and which candidate they were supporting for Sheriff, and when they questioned Michno about the escape, an investigator told him that "SORT was done." (*Id.* ¶ 23; Pls.' LR 56.1(b)(3)(C) Stmt. ¶¶ 5-6.) The investigators stated that "we know you guys had something to do with this because of Remus." (Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 5.) On February 13, 2006, all plaintiffs were de-deputized and suspended with pay pending criminal investigation, which was authorized by Kurtovich and Kaufman. (*Id.* ¶ 7.)

As of February 21, 2006, after Hernandez was suspended, Captain Wright was still unsure whether it was Hernandez or Rodriguez to whom he had spoken on February 11, 2006 regarding a Chicago Police Officer who had forwarded information that ABO Unit inmate Michael McIntosh might possibly have a shank. (Defs.' Ex. 13, Augustyniak Aff. Exs., QH02920-QH02921; *see* Defs.' LR 56.1(a)(3) Stmt. ¶ 37.) It is disputed whether: (1) Hernandez asked Captain Wright for direction as to how to proceed with regard to the information; and (2) Wright told Hernandez that he would seek guidance from the Chief and advise Hernandez what to do with the information but never did. (Pls.' LR 56.1(b)(3)(B) Stmt. ¶ 38; Defs.' Resp. Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 12.) It is also disputed whether Hernandez, on his own, had the authority to order a shakedown or search or whether such an order would have had to come from Director Andrews, his designee, Kurtovich, or Wright himself as the most senior officer on duty at the time. (Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 13; Defs.' Ex. 2, Hernandez Dep. at 133, 137.) Although defendants state that Hernandez did not relay the information about the possible shank to any officer working on the night of February 11, 2006, defendants' fact statement is not supported by any citation to the record. (*See* Defs.' LR 56.1(a)(3) Stmt. ¶ 38.)

It is undisputed that Captain Wright, who did not relay the information up through the chain of command and was not a SORT officer, was never suspended. (Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 65.) Rather, he was promoted to Chief after the escape. (*Id.*)

Defendants state, and plaintiffs dispute, that the basis for plaintiffs' de-deputization, suspension and ultimate transfer (as well as discipline of Hernandez and termination of Davis and Bailey) was not political retaliation. (Pls.' LR 56.1(b)(3)(C) Stmt. ¶¶ 2-7; Defs.' LR 56.1(a)(3) Stmt. ¶ 14; *see* Pls.' Supplemental LR 56.1(b)(3)(C) Stmt. ¶ 10.) Defendants state that their conduct toward plaintiffs was based on the following allegations:

(1) Michno, according to Gater's statement, had knowledge of the escape plan and by failing to report that information, he facilitated the escape.

(2) Rodriguez, according to Gater's statement, had knowledge of the escape plan and by failing to report that information, he facilitated the escape;

(3) Jones, according to Gater's statement, took part in the planning and had knowledge of the escape plan and by failing to report that information, he facilitated the escape.

(4) Davis, according to Gater's statement, was "working with" the escapees (Defs.' LR 56.1(a)(3) ¶ 14(c), and negligently deserted his post when he left his assignment without having an officer relieve him, thereby leaving Gater alone, which subsequently led to the escape; and

(5) Bailey, according to Gater's statement, was "working with" the escapees (*id.*);[3] and

(6) Hernandez failed to conduct a shakedown of the inmates housed in the area of the escape after learning that one of them may have possessed a shank and intended to escape on the

---

[3]Due to defendants' failure to comply with Local Rule 56.1, paragraphs 44 through 46 of defendants' statement of facts with regard to Bailey have been stricken. (*See* Defs.' LR 56.1(a)(3) Stmt. ¶¶ 44-46.)

day of the escape.  (Defs.' Ex. 13, Summary Report, QH02741-QH02743.)

Although the escape occurred in Division 1, no Division 1 officers, including the officer who unlocked the door for the escaping inmates, were criminally investigated, suspended, disciplined or terminated.  (Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 64; Pls.' Supplemental Stmt. Facts Issue Qual. Immunity ¶ 39.)  The non-SORT officers responsible for leaving the garage door open which enabled the inmates to escape also were not criminally investigated or suspended. (*Id.*)

On February 23, 2006, Kurtovich notified plaintiffs that as of February 24, 2006, they were reinstated from suspension-with-pay status and placed on active-duty-with-de-deputized status pending the investigations.  (Defs.' LR 56.1(a)(3) Stmt. ¶ 54.)  On February 23, 2006, Andrews spoke to Michno and Bailey and stated:  "It's political, don't worry about it guys.  It should pass." and "This is bullshit, it's out of my hands . . . . I'm just doing what I'm told to do." (*Id.* ¶ 64; Bailey Dep. at 100.)  On February 24, 2006, Kurtovich transferred:  (1) Jones to "Division VII 7-3 Shift Detail 1" (Defs.' Ex. 18, Mem. of 2/23/06, QH00014); (2) Hernandez to "Division VI 3-11 Shift Detail 2" (*id.*, QH00362); (3) Davis to "Division II 7-3 Shift Detail 2" (*id.*, QH00677); (4) Bailey to "Division V 11-7 Shift Detail 7" (*id.*, QH00766); (5) Michno to "Division V 7-3 Shift Detail 1" (*id.*, QH00818); and (6) Rodriguez to "Division 9" (Defs.' Ex. 3, Rodriguez Dep. at 125).  (Defs.' LR 56.1(a)(3) Stmt. ¶ 54.)  SORT was later disbanded and all SORT officers were reassigned to various divisions of the CCDOC.  (*Id.* ¶ 55.)

On February 27, 2006, with regard to the IAD investigation, the allegations against Michno, Rodriguez and Jones (who had been purportedly implicated directly by Gater's statement) were not sustained due to lack of evidence.  (*Id.* ¶ 51.)  The summary judgment

record does not show whether Michno and Rodriguez were ever re-deputized. It is undisputed that Jones was not cleared of the charges until fifteen months after the escape at which point he was re-deputized. (Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 75.) It was determined that Davis deserted his post on the night of the escape when he left his assignment without having an officer relieve him. (Defs.' LR 56.1(a)(3) Stmt. ¶ 41.) Defendants' statements of fact regarding Bailey have been stricken due to their noncompliance with the Local Rule. It was determined that Hernandez did not act on the information regarding a possible shank on the ABO tier. (*Id.* ¶ 37.)

On March 6, 2007, based on the IAD investigation, Kaufman recommended that the CCDOC terminate Davis and Bailey. (Defs.' Ex. 13, Kaufman Mem. of 3/6/07, QH02735-QH02737.) That same day, Kaufman also recommended that the CCDOC suspend Hernandez for five days. (*Id.*) The record does not show whether Hernandez's deputy status would have been reinstated after the suspension.

Hernandez's last day of work was February 13, 2006. (Defs.' Ex. 2, Hernandez Dep. at 83.) Bailey's last day of work was in the beginning of May 2006. (Defs.' Ex. 7, Bailey Dep. at 8-9.) Michno's last day of work was in late July 2007. (Defs.' Ex. 4, Michno Dep. at 14-15.) Michno was granted duty-related disability leave based on psychological injury from being accused of helping the inmates to escape. (Pls.' Supplemental LR 56.1(b)(3)(C) Stmt. ¶ 33; *id.*, Ex. 7, *In re Michno*, Case No. 08 RBCC 055, Hearing Officer's Recommended Opinion.)[4] Davis was terminated on August 7, 2007. (Defs.' Ex. 5, Davis Dep. at 10.) Rodriguez still

---

[4]To the extent that plaintiffs state that Hernandez and Bailey also took disability leave as a result of their being accused of helping the inmates' escape, plaintiffs failed to provide the cited exhibit to support this supplemental statement of fact, and thus, the Court disregards that portion of the statement.

works for the Cook County Sheriff's Office as a corrections sergeant in Division 2. (Defs.' Ex. 3, Rodriguez Dep. at 7.)

On October 6, 2008, the Cook County Sheriff's Merit Board found that Davis did not negligently desert his post when he left his assignment without having an officer relieve him in violation of the particular orders, rules and regulations under which he was charged and thus Davis' termination was not warranted. (Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 71; Pls.' Ex. H, Cook County Sheriff's Merit Board Decision.) The summary judgment record does not show whether Davis has since been reinstated.

Bailey's appeal of the Cook County Sheriff's Merit Board's decision is still pending. (Pls.' Supplemental LR 56.1(b)(3)(C) Stmt. ¶ 35.)


**Discussion**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To support whether a fact can be or is in genuine dispute, a party must either "(A) cit[e] to particular parts of materials in the record, including depositions, . . . affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials; or (B) show[] that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). Moreover, the court "construe[s] all facts and draw[s] all inferences in the light most favorable to the non-moving party." *Srail v. Vill. of Lisle*, 588 F.3d 940, 943 (7th Cir. 2009). "The existence of merely a scintilla of evidence in support of the non-moving party's position is

insufficient; there must be evidence on which the jury could reasonably find for the non-moving party." *Delta Consulting Group, Inc. v. R. Randle Constr., Inc.*, 554 F.3d 1133, 1137 (7th Cir. 2009).

## I. First Amendment Political Retaliation and Conspiracy

Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . ." 42 U.S.C. § 1983. To bring a claim under § 1983, a plaintiff must establish that: (1) he has been deprived of a federal right, (2) by a person acting under color of state law. *See Alvarado v. Litscher*, 267 F.3d 648, 651 (7th Cir. 2001).

To establish political retaliation in violation of the First Amendment, a plaintiff must "prove by a preponderance of the evidence that his conduct was constitutionally protected, and that the protected conduct was a substantial factor in the decision to terminate him." *Garrett v. Barnes*, 961 F.2d 629, 632 (7th Cir. 1992). "That burden is not insignificant. A disgruntled employee fired for legitimate reasons would not be able to satisfy his burden merely by showing that he carried the political card of the opposition party or that he favored the defendant's opponent in the election." *Nekolny v. Painter*, 653 F.2d 1164, 1168 (7th Cir. 1981). If the plaintiff meets this burden, then the burden shifts to the defendant to prove by a preponderance of the evidence that it would have made the same decision even without political considerations. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Garrett*, 961 F.2d at

632.

Defendants assert that they should be afforded qualified immunity as to plaintiffs'
political retaliation cause of action. "Government officials performing discretionary functions
generally are shielded from liability for civil damages insofar as their conduct does not violate
clearly established statutory or constitutional rights of which a reasonable person would have
known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "We engage in a two-part inquiry in
civil rights actions to assess whether a defendant is entitled to qualified immunity." *Finsel v.
Cruppenink*, 326 F.3d 903, 906 (7th Cir. 2003). A court determines whether, taken in the light
most favorable to the plaintiffs, "the facts show that the [defendant]'s conduct violated a
constitutional right." *Id.* "If a constitutional right is violated, we next determine whether it was
clearly established at the time of the alleged violation." *Id.*

Thus, the Court must determine whether the facts show that defendants violated
plaintiffs' First Amendment rights by retaliating against them for politically supporting Remus
by suspending them with pay, de-deputizing them and transferring them with de-deputized status
to other divisions, as well as disciplining Hernandez and seeking the dismissal of Davis and
Bailey. Defendants first argue that they could not have retaliated against plaintiffs based on their
political support of Remus because they did not know that plaintiffs supported Remus. "In order
to establish that a defendant retaliated against a plaintiff because of a protected constitutional
right, a plaintiff must demonstrate that the defendant knew of the retaliation and knew of the
plaintiff's constitutional activities." *Stagman v. Ryan*, 176 F.3d 986, 999 (7th Cir. 1999). "A
party must present more than mere speculation or conjecture to defeat a summary judgment
motion." *Sybron Transition Corp. v. Sec. Ins. Co. of Hartford*, 107 F.3d 1250, 1254 (7th Cir.

1997).

It is disputed whether Sheahan, Kaufman and Andrews knew that the SORT officers supported Remus. (*See* Defs.' Ex. 8, Sheahan Dep. at 267-78 (stating "I'm somewhat aware that Remus had a following among SORT"); Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 3 (stating that on the night of the escape prior to the investigation, Kaufman said "this smells of Remus," "this is a Remus set up" and "you f***ing jail guards, you'll pay for this"); *id.* ¶ 26; Defs.' Ex. 10, Andrews Dep. at 155 (Andrews stating "I know that [Remus] was respected by the guys on SORT so I know they were behind him."). Further, given that defendants concede that the focus of the investigation was whether the escape was a political stunt to embarrass the Cook County Sheriff's Department so that Remus would be elected, it may be reasonably inferred that CCDOC Executive Director Kurtovich and CCDOC Superintendent Snooks also were aware that plaintiffs supported Remus' candidacy for Cook County Sheriff. (*See* Defs.' Ex. 5, Davis Dep. at 147.)

Defendants have simply failed to meet their burden in establishing that there is no genuine issue of material fact regarding whether their conduct toward plaintiffs was politically motivated. A rational jury, based on the undisputed facts and viewing the disputed facts in nonmovants' favor, could reasonably conclude that defendants' treatment of these SORT officer plaintiffs was motivated by their perceived political support of Remus. While it is certainly understandable that the escape of six inmates would result in a major, wide-sweeping investigation, the pertinent question here is whether there is more than a mere scintilla of evidence that defendants' motivation for their conduct toward the SORT officers was that the SORT officers' supported Remus, rather than Sheahan's endorsed candidate. First, immediately

after the escape and prior to any investigation, Kaufman, the CCDOC Director of Internal Affairs, which is the division that investigated plaintiffs, stated (in Andrews' presence) that the SORT officers would "pay" for the escape that Kaufman believed was instigated by Remus. Further, immediately after making such statements, it is undisputed that Kaufman met with and spoke to all of the investigators, the state's attorneys and Kurtovich and then met with Kurtovich, Andrews and Sheahan for five to six hours. (Pls.' LR 56.1(b)(3)(C) Stmt. ¶¶ 63, 69.) After having met with Kaufman, investigators stated to three of the plaintiffs that SORT officers must have had something to do with the escape because they were Remus supporters. (*Id.* ¶ 5.)

Defendants further argue that Jones, Rodriguez, Michno, Davis and Bailey were targeted for investigation because Gater implicated them by name in a signed statement. However, it is disputed whether the statement was false and coerced and whether ASA Greenstein and the investigators were aware of the fact that the statement was false and coerced. (*Compare* Defs.' LR 56.1(a)(3) Stmt. ¶¶ 61-62, *with* Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 10.) Viewing the disputed facts in plaintiffs' favor, a rational jury could reasonably infer and conclude that Gater's statement contained planted information regarding the political motivation for the escape that was false and coerced, which indicates that the investigation itself was politically motivated.[5]

---

[5] Contrary to defendants' argument otherwise, that Gater has been convicted of official misconduct of aiding the escape of the six inmates does not necessarily resolve the dispute regarding the veracity of his written statement because the record is unclear as to whether the jury concluded that he recklessly failed to perform any mandatory duty as required by law, rather than intentionally did so or knowingly performed an act that he knew was forbidden by law to perform. (*See* Defs.' Reply Supp. Renewed Mot. Qualified Immunity, Ex. C, Certified Stmt. Conviction at 001-002, 013); 720 Ill. Comp. Stat. 5/33-3(a)-(b). Further, Gater was acquitted of the crime of aiding the escape of the six inmates, which would have required that he intentionally or knowingly aided a person in escaping from a penal institution. (*See* Defs.' Reply Supp. Renewed Mot. Qualified Immunity, Ex. C, Certified Stmt. Conviction); 720 Ill. Comp. Stat. 5/31-7. Viewing the facts in plaintiffs' favor, as it must, the Court construes Gater's

Whether Gater's written statement in fact provided the basis for targeting Jones, Rodriguez, Michno, Davis and Bailey or whether it was created out of whole cloth in order to bolster Kaufman's *a priori* judgment that SORT officers orchestrated the escape to help Remus' candidacy is a disputed question of fact for the jury. It also is a question of fact for the jury whether Kaufman's politically based animus tainted the investigation and the decisions of the other defendants who participated in the conduct and/or whether the conduct of the other defendants was independently based on a politically based animus. (*See* Pls.' LR 56.1(b)(3)(C) Stmt. ¶¶ 2-10, 41, 59, 63, 68-69; Defs.' LR 56.1(a)(3) Stmt. ¶¶ 16, 36, 70-73; Defs.' Ex. 8, Sheahan Dep. at 170.) Further, plaintiffs state that they were targeted for criminal and administrative investigation prior to Gater's providing his statement, from which a rational jury could infer that the SORT officers were doomed based on their support for Remus prior to any statement made by Gater. (Pls.' Supplemental LR 56.1(b)(3)(C) Stmt. ¶ 23.) It is also disputed whether Kaufman falsely reported that, on February 11, 2006, Captain Wright had warned one of the defendants of a possible escape, a warning that Wright himself denies occurred, which again, brings into question Kaufman's motivation for the false report. (*Compare* Defs.' LR 56.1(a)(3) Stmt. ¶¶ 16, 37, *with* Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 41.)

Further, with regard to Hernandez, a rational jury could conclude from the summary judgment record that he was also retaliated against based on his support for Remus. In addition to the facts outlined above, it is clear that Andrews and Kaufman were aware that Hernandez supported Remus. Andrews had earlier relayed to Hernandez, whose car had a Remus campaign

conviction as merely requiring that he recklessly failed to perform any mandatory duty as required by law.

sign posted in the back window, to get his "goddamn" car out of the parking lot, and Kaufman sent officers to get Hernandez to remove his car although other CCDOC employees who were also parked in that lot were not asked to remove their cars.   (Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 14.)  It is disputed whether earlier in the day of the escape, Captain Wright told Hernandez that he would instruct him as to how to proceed regarding information that one of the ABO inmates might have a shank and whether Wright ever provided any instructions.  (Defs.' LR 56.1(a)(3) Stmt. ¶ 37; Defs.' Ex. 13, Augustyniak Aff. Exs., QH02920-QH02921; Pls.' LR 56.1(b)(3)(B) Stmt. ¶ 38; Defs.' Resp. Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 12.)  Another unresolved question of fact is whether it was reasonable for defendants to believe that Hernandez had authority to order a shakedown search of the ABO Tier or whether only Director Andrews, his designee, Kurtovich, or Wright himself had such authority.  (Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 13; Defs.' Ex. 2, Hernandez Dep. at 133, 137.)  Although defendants state that Hernandez did not relay this information to any officer working on the night of February 11, 2006, defendants' fact statement is not supported by their citation to the record.  (*See* Defs.' LR 56.1(a)(3) Stmt. ¶ 38.)  It is undisputed that, rather than being disciplined, Captain Wright, who was not a SORT officer and did not document the information about the possible shank, was promoted to Chief after the escape.  (Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 65.)  Hernandez remained under criminal investigation and on active-duty-with-de-deputized-status for a year after the escape.  (*Id.* ¶ 18.)

On February 23, 2006, Andrews, the CCDOC Director of External Operations, spoke to Michno and Bailey and stated with regard to their being transferred with de-deputized status: "It's political, don't worry about it guys.  It should pass." and "This is bullshit, it's out of my hands . . . . I'm just doing what I'm told to do."  (Defs.' LR 56.1(a)(3) Stmt. ¶ 64; Bailey Dep. at

100.)  Although a non-SORT, Division 1 officer unlocked the door that enabled the inmates to escape, he was not detained, criminally investigated or suspended.  (Pls.' Supplemental Stmt. Facts Qualified Immunity ¶ 38.)  Although the escape occurred in Division 1, no Division 1 officers were criminally investigated, suspended or transferred due to the escape.   (Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 64.)  Although the inmates were able to escape because the garage door had been left open, contrary to a general order that it be closed, those responsible for leaving the garage door open were not suspended or transferred.  (*Id.*; Pls.' Supplemental Stmt. Facts Qualified Immunity ¶ 40.)

Next, the Court addresses the second element of the qualified immunity test:  whether the right was clearly established at the time of the alleged violation.  *Wilson v. Layne*, 526 U.S. 603, 609 (1999).  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable [public official] that his conduct was unlawful in the situation he confronted."  *Id.* at 202.  Although qualified immunity is a defense to a § 1983 suit, the plaintiff bears the burden of establishing this element as well.  *Spiegel v. Cortese*, 196 F.3d 717, 723 (7th Cir. 1999).  Plaintiffs "must either (1) present case law that has articulated both the right at issue and applied it to a factual circumstance similar to the one at hand or (2) demonstrate that the contours of the right are so established as to make the unconstitutionality obvious."  *Ault v. Speicher*, 634 F.3d 942, 946 (7th Cir. 2011) (quotation omitted).  "However, the law of qualified immunity does not require a plaintiff to produce a case that is 'directly on point' in order to show that a right is clearly established.  *Kiddy-Brown v. Blagojevich*, 408 F.3d 346, 356 (7th Cir. 2005) (quoting *Nabozny v. Podlesny*, 92 F.3d 446, 456 (7th Cir. 1996)).  "The question is whether a reasonable state actor would have known that his

actions, viewed in the light of the law at the time, were unlawful." *Nabozny*, 92 F.3d at 456. The defendants must respond by establishing, "through prior decisions or otherwise, that they could reasonably have believed that their acts were constitutionally permissible, either because the plaintiff's right was not so clearly established that the unlawfulness of their acts was apparent, or because political allegiance actually was a legitimate job requirement in the particular case." *Pounds v. Griepenstroh*, 970 F.2d 338, 340 n.2 (7th Cir. 1992).

Plaintiffs have shown that when defendants suspended, de-deputized, and transferred plaintiffs as well as disciplined Hernandez and terminated Davis and Bailey, the law was clear that employees are protected by the First Amendment when they support a political candidate of their choice, and may not be retaliated against based on their political affiliations. *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 65, 71 n.5 (1990); *Elrod v. Burns*, 427 U.S. 347, 367, 375 (1976); *Hall v. Babb*, 389 F.3d 758, 762 (7th Cir. 2004). The Seventh Circuit "has held clearly that political affiliation is a legitimate criterion for government employment only for those positions that 'authorize[ ], either directly or indirectly, meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation.'" *Kiddy-Brown*, 408 F.3d at 356 (quoting *Nekolny*, 653 F.2d at 1170).

Defendants concede that plaintiffs are not employees for which political affiliation is a legitimate criterion. (Defs.' Resp. Court's Feb. 13, 2012 Order 5.) Rather, defendants argue that they could have reasonably believed that their complained-of conduct toward plaintiffs, who were assigned to monitor the part of the jail from which six violent felons escaped, was

constitutionally permissible because defendants suspected plaintiffs' complicity in the escape.[6]

However, it is disputed whether defendants immediately suspected complicity by SORT officers due to their political support of Remus even before the investigation, a fact that the Court must view in favor of the nonmovants. (Pls.' LR 56.1(b)(3)(C) Stmt. ¶ 3; Defs.' LR 56.1(a)(3) Stmt. ¶ 63.) In this unique case and based on the particular facts before the Court, it is impossible to treat the concept of suspected complicity separately from political affiliation. Whether defendants' suspension, de-deputization and transfer of all plaintiffs after the escape (as well as their disciplining Hernandez and seeking termination of Davis and Bailey) was predicated on cause to believe that plaintiffs had engaged in criminal or other conduct that aided the inmates' escape or whether it was a politically charged witch hunt to blame solely these SORT officers because they supported Remus is a key issue that must be resolved prior to determining whether qualified immunity applies. *Cf. Zorzi v. County of Putnam*, 30 F.3d 885, 893 (7th Cir. 1994) ("This line of reasoning, however, begs the question: Why did Hansen fire Zorzi?"); *O'Connor v. Chi. Transit Auth.*, 985 F.2d 1362, 1367 (7th Cir. 1993) ("As there was a disputed factual issue regarding why defendant dismissed plaintiff, the district court was in no position to grant summary judgment in defendant's favor on the issue of qualified immunity against plaintiff's First Amendment claims. Resolution of this issue is a predicate to any meaningful qualified immunity analysis."), *overruled in part on other grounds by Spiegla v. Hull*, 371 F.3d 928, 941 (7th Cir. 2004). Accordingly, the Court denies defendant's renewed

---

[6]Defendants concede that they investigated plaintiffs because Gater's statement implicated them. (Defs.' Mem. Supp. Renewed Mot. Qualified Immunity 13.) However, as discussed above, plaintiffs have successfully created genuine issues as to material facts regarding whether Gater's statement was fabricated by defendants and investigators.

motion for qualified immunity.

## II.  Local Governmental and Governmental Employees Tort Act

Defendants also renew their motion to dismiss the complaint based on the Local Governmental and Governmental Employees Tort Immunity Act.  On September 4, 2008, the Court denied defendants' motion to dismiss as moot because defendants had filed a motion for summary judgment that the Court perceived had addressed all of the issues raised in defendants' motion to dismiss.  The Court views defendants' renewed motion to dismiss based on state law tort immunity as a motion to reconsider its September 4, 2008 ruling and grants the motion because defendants' motion for summary judgment failed to address state law tort immunity.

On a Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded factual allegations of the complaint, drawing all reasonable inferences in plaintiff's favor.  *Hecker v. Deere & Co.*, 556 F.3d 575, 580 (7th Cir. 2009).  "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations" but must contain "enough facts to state a claim for relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Section 2-202 provides that "a public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct."  745 Ill. Comp. Stat. 10/2-202.  Willful and wanton conduct is defined as "a course of action which shows an actual or deliberate intention to cause harm or which, if not intentional, shows an utter indifference to or conscious disregard for the safety of others or their property."  *Id.* 10/1-210.

Defendants argue that they are not liable for injury arising out of an investigation of the escape from the jail and the employment actions taken by the defendants where such action is expressly or impliedly authorized by law because Kaufman had a duty to investigate the jailbreak. Whether defendants had valid reasons for investigating, suspending, disciplining, terminating plaintiffs criminally and administratively pursuant to Kaufman's legal authority or whether their conduct toward plaintiffs was willful and wanton in that they intended to cause plaintiffs harm based on their political support for Remus are issues of fact that cannot be determined on a motion to dismiss. If, as alleged, defendants fabricated Gater's statement and launched trumped up allegations against them, they would have lacked an honest suspicion that plaintiffs had violated any law, rule, order or policy. (First Am. Compl. ¶¶ 11-12, 19, 24-25, 33-34, 40-41, 47-48, 76, 79, 80, 87, 89, 93-94, 96, 100, 104-05, 108, 112-17, 120-21, 125-28, 131.) Therefore, the Court denies defendants' motion to dismiss without prejudice based on state law tort immunity.

<u>Conclusion</u>

For the reasons stated above, the Court denies defendants' renewed motion for summary judgment based on qualified immunity [298]. The parties shall be prepared to set a trial date and a date for the filing of the final pretrial order at the status hearing set on April 25, 2012 at 9:30 a.m.

**SO ORDERED**                                **ENTERED:  March 30, 2012**

_Ronald A. Guzman_

_____

**RONALD A. GUZMAN**
**United States District Judge**