UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IVAN HERNANDEZ, ROBERTO RODRIGUEZ, BILL JONES, GENE MICHNO, MARVIN BAILEY AND RICHARD DAVIS, | |
| Plaintiffs, | No. 07 C 855 |
| v. | Judge Thomas M. Durkin |
| COOK COUNTY SHERIFF'S OFFICE, MICHAEL F. SHEAHAN, in his official capacity, CAROL KAUFMAN, as representative of the estate of TIMOTHY KAUFMANN, in his individual capacity, SCOTT KURTOVICH, in his individual capacity, DENNIS ANDREWS, in his individual capacity, THOMAS SNOOKS, in his individual capacity, the COUNTY OF COOK, | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Six correctional officers with the Cook County Sheriff's Office, Department of Corrections ("DOC"), (namely, Ivan Hernandez, Roberto Rodriguez, Bill Jones, Gene Michno, Marvin Bailey, and Richard Davis (collectively "Plaintiffs")), allege that the Cook County Sheriff's Office, former Cook County Sheriff Michael Sheahan, and certain officials in his office (namely, Timothy Kaufmann, Scott Kurtovich, Dennis Andrews, and Thomas Snooks) (collectively, "Defendants"), violated the First Amendment and state law by conspiring to discriminate and retaliate against Plaintiffs for their support of a certain candidate in the election for sheriff by

investigating and disciplining Plaintiffs in connection with an escape from the Cook County Jail. R. 55. The Seventh Circuit previously found that the individual defendants are qualifiedly immune to Plaintiffs' First Amendment political retaliation and conspiracy claims (Counts I and IV). *See Hernandez v. Sheahan*, 711 F.3d 816 (7th Cir. 2013).[1] Defendants have moved for summary judgment on the remaining First Amendment political retaliation claim against the Sheriff's Office (Count III) and the claim for intentional infliction of emotional distress against the individual defendants (Count V). R. 396.[2] For the following reasons, Defendants' motion for summary judgment is denied.

## Background

Plaintiffs were assigned to the Special Operations Response Team ("SORT"), which was responsible for guarding the most dangerous inmates in the Abnormal Behavioral Observation Unit (the "ABO") at the Cook County Jail. R. 434 ¶ 9. SORT's Superintendent was Richard Remus, and SORT was known in the Sheriff's Office as "Remus's Unit." *Id.* ¶ 11. All of the Plaintiffs actively supported Remus in his campaign leading up to the March 21, 2006 Democrat primary election for Cook County Sheriff against Tom Dart—the chief of staff to Sheriff Sheahan—who

---

[1] The Court also previously granted summary judgment to Defendants on a separate First Amendment retaliation claim—unrelated to the election for sheriff—in which Plaintiffs alleged that Defendants retaliated against them for complaints they made about conditions at the Cook County Jail (Count II). R. 226. The Court also dismissed Plaintiffs' claim of false imprisonment (Count VI). R. 371; R. 395.

[2] The parties do not address the conspiracy claim as it relates to the Sheriff's Office, and the Court will not address it except to note that the questions of fact the Court identifies with respect to Plaintiffs' retaliation claim serve equally to create questions of fact regarding the conspiracy claim.

2

Sheahan supported as a candidate in the sheriff election. *See* R. 434 ¶ 11; R. 148-2 at 67-70 (266:3–268:10).

On February 11, 2006, just before midnight, several detainees escaped from the ABO at the Cook County Jail. *See* R. 177 ¶¶ 5-6. Shortly after the escape, early on February 12, Michno, Davis, and Bailey heard Kaufmann—the Director of Internal Affairs for the DOC—scream the following statements: "this smells like Remus"; "this is a Remus set up"; "these fucking jail guards"; "you fucking jail guards, you'll pay for this"; "this smelled like Remus's shit." R. 147-4 at 26 (90:24–91:3, 93:6-7); R. 147-5 at 24 (85:21–86:2), 27 (98:12), 34 (127:13-16); R. 148 at 20 (61:1-9), 25 (78:18-20). Miriam Rentas—who was the Assistant Director of Internal Affairs for the DOC—has filed an affidavit in which she states that she was also present when Kaufmann is alleged to have made these statements, but she does not recall him saying, "this smells of Remus." R. 199-2 ¶¶ 1-2, 6-7.

Later that day, a correctional officer, Darin Gater, confessed to being complicit in the escape. *See* R. 150-2; R. 154-2. Gater also implicated Plaintiffs (except for Hernandez) and stated they were motivated to "help [Richard] Remus" in his campaign to be elected sheriff by discrediting Sheriff Sheahan and Dart. R. 150-2 at QH03222; R. 154-2 at 134. Plaintiffs note that Gater claims that his statement was coerced. R. 433 at 8 n.5. This argument was raised in Gater's state court trial and the state court found that the statement was not coerced. R. 312-4 at 5-6. The Seventh Circuit found that Defendants had probable cause to investigate Plaintiffs on the basis of Gater's statement. *Hernandez*, 711 F.3d at 817-18. In addition to

3

Gater's statement, the investigation into the jail break revealed that Hernandez was notified on the day of the jail break by Captain Earnest Wright that there might be a shank in the ABO, and Hernandez failed to communicate this information to any officer on duty in the ABO the night of the escape. *See* R. 400-7 at 33 (124:8-9); R. 401-5 at 26-27 (QH02764-65).

On February 13, 2006, Plaintiffs were suspended pending the investigation into the jail break. R. 149 at 73-78. Plaintiffs' suspensions were signed by Kurtovich—the Assistant Executive Director of the DOC. *Id.* Plaintiffs were also de-deputized pending the investigation. *Id.* at 85-90. Kaufmann and Kurtovich signed the order de-deputizing Plaintiffs. *Id.* Andrews—the Director of External Operations of the DOC—also "signed off" on the complaints against the Plaintiffs. R. 434 ¶ 44.

On February 23, 2006, Plaintiffs were "reinstated from 'Suspension with Pay' . . . to 'Active' duty with De-Deputized status. . . . [and were] transferred [out of SORT]." R. 177 ¶ 54; R. 154-6 at 3-7; R. 199 ¶ 8. When Andrews informed Michno and Bailey of their reassignments he told them that the investigations were "political." R. 177 ¶ 64; R. 147-4 at 31 (112:20-24). Specifically, Bailey testified that Andrews "gave [them] a handshake and a pat on the back and said, guys, this is -- don't worry about it. It's political, some political bullshit, and it should pass over pretty soon." R. 148 at 28 (93:2-5).

Four days later on February 27, 2006, Investigator Stanley Augustyniak submitted an investigation report finding that Davis and Bailey had deserted their

4

posts the night of the escape. R. 401-5 at 21-24 (QH02759-62). Kaufmann signed the memoranda recommending their termination. R. 149 at 25-26 (QH02735-36). On October 6, 2008, the Cook County Sheriff's Merit Board overturned the investigation's findings with regard to Davis. R. 178-3 at 44-47. Bailey's termination was upheld after several rounds of appeal. *See Bailey v. Dart*, 2012 WL 6951971 (Ill. App. Ct. 1st Dist. Jan. 17, 2012). Augustyniak also found that Hernandez failed to conduct a search of the jail after he received word that an inmate might be in possession of a shank. R. 401-5 at 25 (QH02763). Kaufmann signed the memorandum suspending Hernandez for five days. R. 149 at 27 (QH02737). The investigation found insufficient evidence to sustain the charges against Jones, Rodriguez, and Michno, and the administrative charges against them were dismissed. R. 434 ¶ 27.

Augustyniak filed an affidavit stating that his "investigation and the subsequent report prepared as a result of the investigation [were] not influenced in any way by the actions, directives or other input of [the individual defendants]." R. 400-2 at 3 (¶ 7). Assistant State's Attorney Bonnie Greenstein also participated in the investigation and submitted an affidavit describing her work. Like Augustyniak, she stated that her "review was not influenced in any way by the actions, directives or other input of [the individual defendants]." R. 400-4 at 2 (¶ 5). Sergeant Robert Fitzgerald of the Cook County Sheriff's Police Department Jail Enforcement Unit also participated in the investigation and preparation of the report. Fitzgerald submitted an affidavit stating that he followed procedure in

5

conducting the investigation and producing the report, but he did not mention the individual defendants. *See* R. 400-3 at 2-4.

Plaintiffs allege that they have suffered severe emotional distress as a result of the investigations into, and discipline of, their conduct. Specifically, the six plaintiffs submit the following evidence regarding emotional distress:

- **Michno** filed an affidavit stating that he has suffered "severe emotional distress" as a result of the investigation and discipline Defendants imposed on him after the jail escape. *See* R. 435-2 at 481 (¶ 13). Due to this emotional distress, Michno applied for "duty disability" with the Cook County Pension Board. The Pension Board Hearing Officer found that "Michno is entitled to duty related disability benefits for a psychological injury occurring on or about February 13, 2006." R. 311-1 at 103. Dr. Martins A. Adeoye, a psychiatrist, diagnosed Michno as suffering from depression, anxiety, and post-traumatic stress disorder. R. 435 Ex. S-1 at KLO01896 (filed under seal).[3] Dr. Adeoye prescribed medications for these conditions and concluded that Michno was "unable to return to work" and that his "disability may continue to last about 6 months to 2 years." *Id.* at KLO01905. Michno has also submitted a letter from a licensed clinical social worker describing Michno's depression. *Id.* at KLO01899.

- **Hernandez** filed an affidavit describing his "severe emotional distress and depression" that he suffers "as a result of the discrimination and retaliation" by Defendants. R. 435-2 at 484 (¶ 3). Hernandez is on disability leave from the Sheriff's Office and has filed an application for duty-related disability with the Cook County Pension Board, which is still pending. R. 440 ¶ 62. Dr. Richard S. Abrams has diagnosed Hernandez with a "severe depressive reaction to [his] job circumstance." R. 435 Ex. S-2 at RB00114 (filed under seal). Dr. Abrams prescribed medications to address these conditions. *Id.* at RB00113. Hernandez filed an affidavit stating that his "depression affects all aspects of [his] life," that he is "terrified to go anywhere," and that he suffers from nightmares. R. 435-2 at 484 (¶ 3).

- **Davis** testified that he has suffered "[e]motional damage, humiliation, disgrace of [his] family, [his] wife, [and] [i]t's caused a great strain with [his]

---

[3] The Court describes generally the information about Plaintiffs' diagnoses and medications contained in the medical records Plaintiffs have filed under seal as the specific diagnoses and medications are unnecessary to decide this motion.

6

wife." R. 398-3 at 61 (240:13-15). Davis cites no other evidence to support his claim of severe emotional distress.

- **Rodriguez** filed an affidavit describing his "severe emotional distress and depression" that he suffers "as a result of the discrimination and retaliation" by Defendants. R. 435-2 at 487 (¶ 2). Rodriguez describes his emotional state as follows: "I suffered humiliation, anger, and fear. I withdrew from my family and friends. My kids suffered as a result. I was paranoid and afraid that supervisors would set me up again. I was worried about my safety and the safety of my children. I could not sleep, and was only sleeping about an hour or two a day for over a year. I got rid of both of my firearms because I did not want to be set up again. I had thoughts of suicide because I was so depressed." *Id.* Rodriguez also states, "My character has been altered and I am not the same person that I was before all of this. Before February 2006, I was fun-loving and trusting, and had a strong belief in law enforcement and the justice system. I don't anymore. I also don't let people get close to me and have lost trust in people." *Id.* (¶ 3). Rodriguez cites no other evidence to support his claim of severe emotional distress.

- **Jones** filed an affidavit describing his "severe emotional distress and depression" that he suffers "as a result of the discrimination and retaliation" by Defendants. R. 435-2 at 490 (¶ 2). Jones describes his emotional state as follows: "[a] I had to start taking blood-pressure medication and started biting my nails; [b] I am always paranoid of supervisors, even to this day, every day that I am at work; [c] I isolate myself at work and from friends and family; [d] I have withdrawn and I don't socialize any more or as much at work or outside of work; [e] It is difficult for me to do my job, and I am always worried when I am moved from one Division to another for fear that they are going to set me up; [f] I lost intimacy with my wife. We sleep in separate bedrooms even to this day; and [g] I had nightmares and still have nightmares." *Id.* Jones cites no other evidence to support his claim of severe emotional distress.

- **Bailey** testified that he experienced "anxiety attacks shortly after the escape [and] after [he] was accused of being part of the escape," and that he saw a doctor for this reason. R. 400-10 at 5 (11:7-9). Bailey also testified, "After the escape I was feeling paranoid as if the sheriff's department was plotting against me, so I couldn't sleep, stayed in my house probably for a week or so and [was] just depressed." *Id.* at 6 (15:7-11). Dr. Gerri C. Browning diagnosed Bailey as suffering from depression, anxiety, and panic attacks, and described his symptoms as "trouble sleeping, headache, diminished appetite . . . and [increased] heart rate." R. 435 Ex. S-3 (filed under seal). He was prescribed medication to address these conditions. *Id.*

7

**Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Ball v. Kotter*, 723 F.3d 813, 821 (7th Cir. 2013). To defeat summary judgment, a nonmovant must produce more than "a mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Harris N.A. v. Hershey*, 711 F.3d 794, 798 (7th Cir. 2013). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

**Analysis**

**I. Count III: First Amendment Retaliation Claim Against the Sheriff's Office**

Plaintiffs argue that Kaufmann's statements the night of the escape and Andrews's statements during the course of the investigation create a question of material fact regarding whether Defendants' decisions to investigate and discipline Plaintiffs was motivated by Plaintiffs' support of Remus in the election for sheriff. Defendants argue that the investigation and discipline were driven by probable cause based on Gater's confession, and thus, they did not violate Plaintiffs' civil

rights. Defendants also argue that there is insufficient evidence to show that the Sheriff's Office is responsible for any civil rights violation that may have occurred.

## A. Evidence of a Constitutional Violation

In order to establish that an employer discriminated or retaliated against an employee for speech protected by the First Amendment, a plaintiff must show that: "[1] the employee's speech [was] constitutionally protected; [2] the plaintiff must demonstrate that but for the protected speech the employer would not have taken the same action; and [3], the plaintiff must have suffered a deprivation because of the employer's action." *Kodish v. Oakbrook Terrace Fire Protection Dist.*, 604 F.3d 490, 501 (7th Cir. 2010). A plaintiff survives a motion for summary judgment on such a claim "if he can demonstrate triable issues as to whether the discrimination motivated the adverse employment action." *Id.* (internal quotation omitted). However, summary judgment in the defendant's favor is appropriate if the defendant can demonstrate that there is no genuine question of material fact as to whether the employer would have taken the action even absent the protected speech; in other words, "the harm would have occurred anyway" despite the motivation to violate the plaintiff's First Amendment rights. *See Thayer v. Chiczewski*, 705 F.3d 237, 252 (7th Cir. 2012).

Here, the question is whether Kaufmann and Andrews's statements indicating a political motivation for Defendants' decision to investigate and discipline Plaintiffs create a triable issue of fact regarding the motivation for Defendants' decision to investigate and discipline Plaintiffs despite the fact that

9

Defendants had probable cause to take those actions. The Seventh Circuit held that Defendants had probable cause to investigate Plaintiffs, and Defendants argue that even assuming that Kaufmann and Andrews made the statements they are alleged to have made, Gater's statements and the evidence against Hernandez demonstrate that the investigation and discipline would have occurred anyway.

The existence of probable cause might have been enough to grant Defendants' motion if Kaufmann's statements were the only evidence of political motivation. "Relief for the violation of a constitutional right is inappropriate . . . 'in cases where . . . dramatic and perhaps abrasive [protected speech] is inevitably on the minds of those responsible for [an adverse action] . . . and does indeed play a part in that decision . . . if the same decision would have been reached had the incident not occurred.'" *Greene v. Doruff*, 660 F.3d 975, 979 (7th Cir. 2011) (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 285-86 (1977)). The Seventh Circuit illustrated this principle with a hypothetical, noting that a jail warden's policy to "discipline any inmate who filed a grievance against [the warden] no matter how justified the grievance" would be a *sufficient* condition of the inmate's constitutional harm, but not a *necessary* condition if the inmate violated a prison regulation in the course of filing his grievance (i.e., photocopying prison library documents without permission) that resulted in the same discipline the warden intended to impose for filing the grievance itself. *See Greene*, 660 F.3d at 978. Applying the principle to this case, even if Kaufmann's statements show that the Sheriff's Office intended to politically retaliate against Plaintiffs, the injury for

10

which Plaintiffs seek redress would have occurred anyway due to the probable cause created by Gater's confession.

The problem with Defendants' argument is that, according to Michno and Bailey, Andrews told them that the investigation was politically motivated several days *after* Gater's confession. Since Andrews stated that the investigation was politically motivated after Gater confessed, Andrews's statement is evidence that Defendants themselves did not put much stock in Gater's confession and that Defendants' true motivation was discriminatory and retaliatory. If Gater's statement was a sufficient basis to investigate Plaintiffs, Andrews would most likely not have continued to maintain that the investigation was politically motivated. Andrews's statement is evidence that political motivation was not merely a *sufficient* cause of the harm Plaintiffs' suffered, but a *necessary* cause, because Andrews's statement indicates that Gater's statement was an insufficient basis for the investigation and discipline in Defendants' estimation. A rational jury could find on the basis of Kaufmann and Andrews's statements taken together that Gater's statement was not a sufficient cause of Defendants' decision to investigate and discipline Plaintiffs, and that political animus was the true motivation.

Defendants make two other arguments that do not alter the Court's analysis. First, Defendants cite a Sheriff's Office policy that mandates an investigation of any jail escape. *See* R. 397 at 10. Of course, it is not surprising that the Sheriff's Office investigated the escape. The issue here, however, is the motivation for choosing the individuals who were the focus of the investigation, *not* the mere fact that the

11

Sheriff's Office undertook an investigation of the escape. An investigation was required, but there is no Sheriff's Office policy that mandated that these particular six individuals needed to be the investigation's targets.

Second, Defendants cite Augustiniak and Greenstein's affidavits stating that none of the individual defendants influenced their investigation to support their argument that any political motivation Defendants may have had to investigate Plaintiffs did not *cause* the investigation and discipline. R. 439 at 5-6. Augustiniak and Greenstein's statements, however, do not negate the evidence (specifically, the statements by Kaufmann and Andrews) that the investigation and discipline was politically motivated. Moreover, Kaufmann, Kurtovich, and Andrews signed the papers initiating the investigation and suspending and de-deputizing Plaintiffs. This evidence shows that Sheriff Sheahan, Kaufmann, Kurtovich, and Andrews—not Augustiniak and Greenstein—had the power to initiate the investigation and to determine the resulting discipline. Augustiniak and Greenstein most likely had control over the course and manner of investigation, but there is no evidence that they were involved in the decision to initiate the investigations or determine whether discipline would actually be imposed. Despite the investigators' statements of independence and impartiality, a question of fact remains as to the cause of the investigation and discipline Plaintiffs suffered.

Therefore, summary judgment in Defendants' favor regarding whether Plaintiffs' civil rights were violated is not warranted.

## B. Evidence of the Sheriff's Office's Liability

Defendants also argue that even if the individual defendants violated Plaintiffs' civil rights, there is no evidence that the Sheriff's Office was the "moving force" behind the constitutional violation, as is required for municipal liability under 42 U.S.C. § 1983. *See Monell v. City of New York*, 436 U.S. 658, 694 (1978); *see also City of Canton v. Harris*, 489 U.S. 378, 389 (1989); *accord Teesdale v. City of Chicago*, 690 F.3d 829, 833 (7th Cir. 2012). "A local governing body," like the Sheriff's Office, "may be liable for monetary damages under § 1983 if the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010). The official in question does not have to be "a policymaker on all matters for the municipality, but . . . [only] a policymaker in [the] particular area, or on [the] particular issue." *Valentino v. Village of South Chicago Heights*, 575 F.3d 664, 676 (7th Cir. 2009). Whether a particular official is a policymaker can be a question of fact for a jury. *See Kujawski v. Bd. of Comm'rs of Bartholomew Cnty.*, 183 F.3d 734, 739 (7th Cir. 1999).

Here, there is at least a question of fact as to whether the investigation into, and discipline of, Plaintiffs' conduct was caused by "an official with final policy-making authority." Michno, Davis, and Bailey have testified that Kaufmann stated that the investigation and discipline was politically motivated. Kaufmann was the

13

Director of Internal Affairs for the DOC and he signed the forms de-deputizing Plaintiffs, firing Davis and Bailey, and suspending Hernandez. Furthermore, Defendants admit that "Sheriff Sheahan testified that Chief Kaufmann was not required to report to him in any investigation." R. 199 ¶ 7 (citing R. 148-2 at 20 (72:13-17)). Based on this evidence, a reasonable juror could conclude that Kaufmann was a policymaker for purposes of the investigation into the jail break because he had the power to both initiate the investigation into Plaintiffs' conduct and to discipline them for it. Thus, summary judgment in Defendants' favor on the issue of the Sheriff's Office's liability for any violation of Plaintiffs' civil rights is not warranted.[4]

## II. Count V: Intentional Infliction of Emotional Distress Claim Against the Individual Defendants

Under Illinois law, for an intentional infliction of emotional distress claim to be successful the following elements must be proven: "(1) the defendants' conduct was extreme and outrageous; (2) the defendants knew that there was a high probability that their conduct would cause severe emotional distress; and (3) the conduct in fact caused severe emotional distress." *Swearnigen–El v. Cook Cnty. Sheriff's Dep't*, 602 F.3d 852, 864 (7th Cir. 2010) (citing *Kolegas v. Heftel Broad.*

---

[4] Plaintiffs' also cite evidence from *Shakman v. Cook County Democratic*, 69 C 02145 (N.D. Ill.), and *Burruss v. Cook County*, 08 C 6621 (N.D. Ill.), and testimony from Douglas Zimny, to support their argument that the Sheriff's Office has a practice or custom of discriminating against employees based on their political affiliations. R. 433 at 18-20. Based on the Court's holding, it is not necessary for the Court to reach this argument, and the Court reserves ruling on whether this evidence is relevant or admissible in this case. The parties should be prepared to fully brief the relevance of this evidence (citing relevant case law authority) on motions *in limine* prior to trial.

*Corp.*, 607 N.E.2d 201, 211 (Ill. 1992)). "To meet the 'extreme and outrageous' standard, the defendants' conduct 'must be so extreme as to go beyond all possible bounds of decency, and to be regarded as intolerable in a civilized community.'" *Swearnigen–El*, 602 F.3d at 864 (quoting *Kolegas*, 607 N.E.2d at 211). In determining whether conduct meets the "extreme and outrageous" standard, courts consider three main factors: (1) "the more power or control the defendant has over the plaintiff, the more likely the conduct will be deemed extreme"; (2) "whether the defendant reasonably believed its objective was legitimate"; and (3) "whether the defendant was aware the plaintiff was 'peculiarly susceptible to emotional distress, by reason of some physical or mental peculiarity.'" *Franciski v. Univ. of Chi. Hosp.*, 338 F.3d 765, 769 (7th Cir. 2003) (quoting *McGrath v. Fahey*, 533 N.E.2d 806, 811 (Ill. 1998)). The Illinois Supreme Court has explained, "Conduct is of an extreme and outrageous character where 'recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!''" *Doe v. Calumet City*, 641 N.E.2d 498, 507 (Ill. 1994) (quoting Restatement (Second) of Torts § 46, cmt. D, at 73 (1965)).

### A. Extreme and Outrageous Conduct

Although "typical disagreements or job-related stress caused by the average work environment" are insufficient to support a claim for intentional infliction of emotional distress, *see Lewis v. Sch. Dist. # 70*, 523 F.3d 730, 747 (7th Cir. 2008), such conduct can be extreme and outrageous when the employer or supervisor knows that there is no legitimate objective for the disciplinary investigation. *See*

15

*Franciski*, 338 F.3d at 769. In such circumstances, the "extreme and outrageous nature of the conduct may arise not so much from what is done as from abuse by the defendant of some relation or position which gives him actual or apparent power to damage the plaintiff's interests. The result is something very like extortion." *Milton v. Ill. Bell Tel. Co.*, 427 N.E.2d 829, 832 (Ill. App. Ct. 1st Dist. 1981) (citation omitted). In the employment context, "courts have found extreme and outrageous behavior to exist . . . where the employer clearly abuses the power it holds over an employee in a manner far more severe than the typical disagreements or job-related stress caused by the average work environment." *Honaker v. Smith*, 256 F.3d 477, 491 (7th Cir. 2001). Indeed, Illinois courts have held that a "sham" or improperly motivated investigation into, and discipline of, an employee's conduct can be "extreme and outrageous." *See Graham v. Commonwealth Edison Co.*, 742 N.E.2d 858, 868 (Ill. App. Ct. 1st Dist. 2000); *see also Vickers v. Abbott Labs.*, 719 N.E.2d 1101, 1115 (Ill. App. Ct. 1st Dist. 1999) ("a conspiracy or a systematic effort to remove plaintiff from his managerial position" in the employment context can be extreme and outrageous). Thus, a reasonable jury could hold that Defendants' political motivation for investigating and disciplining Plaintiffs, if true, is extreme and outrageous conduct.

Defendants argue that the Seventh Circuit's holding that Defendants had probable cause to investigate and discipline Plaintiffs precludes the possibility that Defendants' conduct was improperly motivated. As the Court held previously in the course of this litigation, however, probable cause is *not* a bar to liability for

16

intentional infliction of emotional distress. *See Hernandez v. Cook Cnty. Sheriff's Office*, 2013 WL 5913746, at *4 (N.D. Ill. Oct. 7, 2013). Rather, "the existence of probable cause [is] relevant" to whether a decision to investigate was "extreme and outrageous." *Id.*

Despite the fact that probable cause is not a bar to liability for intentional infliction of emotional distress, in *Swearnigen-El* the Seventh Circuit upheld a district court's summary judgment decision that the Sheriff's Office could not be liable for intentional infliction of emotional distress for investigating an employee based on probable cause, even though there was a question of fact in that case as to whether the investigation and discipline of an employee was "triggered" by a discriminatory and retaliatory motive. 602 F.3d at 864. Unlike *Swearnigen-El*, however, the evidence here does not merely show that Defendants' investigation was "triggered" by a retaliatory motive, and subsequently justified by evidence uncovered creating probable cause. Rather, the evidence here (in the form of Andrews's stating that the investigation was politically motivated *after* Gater had made his confession) tends to show that the Sheriff's Office did not put much stock in the evidence supporting probable cause (i.e., Gater's confession) and instead continued to pursue the investigations against Plaintiffs for political reasons. This evidence that Defendants' investigation into, and discipline of, Plaintiffs was both triggered and maintained by a retaliatory motive is a sufficient basis for a jury to conclude that Defendants' conduct was extreme and outrageous.

### B. Severe Emotional Distress

Defendants also argue that there is insufficient evidence for a jury to find that each plaintiff suffered severe emotional distress. R. 397 at 13-14. "Courts have consistently held that '[a]lthough fright, horror, grief, shame, humiliation, etc. may fall within the ambit of the term 'emotional distress,' these mental conditions alone are not actionable.'" *Redd v. Dougherty*, 578 F. Supp. 2d 1042, 1058 (N.D. Ill. 2008) (quoting *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1030 (7th Cir. 2006)). Rather, "'[t]he law intervenes only where the distress inflicted is so severe that no reasonable [person] could be expected to endure it.'" *Honaker*, 256 F.3d at 495 (quoting *Welsh v. Commonwealth Edison Co.*, 713 N.E.2d 679, 684 (Ill. 1999)). Nevertheless, Illinois courts have found that symptoms of emotional distress similar to Plaintiffs' can be sufficient to support a claim of intentional infliction of emotional distress. *See Graham*, 742 N.E.2d at 869 ("[The employee] received treatment from a psychologist and also suffered physical manifestations of the distress. [The employee] endured stomach pain, lack of sleep, headaches, and saw a dermatologist for stress-related acne."). Additionally, the Illinois Supreme Court has held that the "extreme and outrageous character of the defendant's conduct [can be] in itself important evidence that the distress has existed." *Kolegas*, 607 N.E.2d at 213. The Seventh Circuit has likewise noted that point, explaining that "Illinois courts . . . have tended to merge the issue of the outrageousness of the defendant's conduct with the issue of the severity of the plaintiff's emotional distress, in effect requiring more evidence of outrageousness the weaker the evidence of distress."

18

*Honaker*, 256 F.3d at 496; *cf. Denius v. Dunlap*, 330 F.3d 919, 929 (7th Cir. 2003) ("[B]are allegations by a plaintiff that the defendant's conduct made [the plaintiff] 'depressed,' 'humiliated,' of the like are not sufficient to establish injury unless the facts underlying the case are so inherently degrading that it would be reasonable to infer that a person would suffer emotional distress from the defendant's action.").

Michno, Hernandez, and Bailey have presented evidence sufficient for a reasonable juror to conclude that they suffered severe emotional distress. In addition to their own personal statements describing the stress and anxiety they have suffered due to the criminal investigation to which Defendants subjected them, these three plaintiffs have submitted medical records corroborating their descriptions of their conditions, and prescribing them medication. This evidence creates a genuine question of fact as to whether Michno, Hernandez, and Bailey suffered severe emotional distress.

Unlike Michno, Hernandez, and Bailey, the other three plaintiffs—Davis, Rodriguez, and Jones—have failed to produce direct evidence to corroborate their statements that they have suffered severe emotional distress. Nevertheless, if a jury were to find that Defendants initiated a criminal investigation against Plaintiffs based on political motivation, a reasonable jury could also find that the "character" of Defendants' conduct is such that it would inevitably cause severe emotional distress. *See Kolegas*, 607 N.E.2d at 213. Defendants' conduct did not merely expose Plaintiffs to the threat of the loss of their employment; Plaintiffs faced the threat of imprisonment as well. Defendants surely knew that the threat of imprisonment

19

would cause Plaintiffs severe emotional distress, especially since Plaintiffs are correctional officers. Moreover, if Defendants' actions were in fact politically motivated, causing such distress was likely their goal. Notably, Kaufmann and Andrews allegedly stated as much. Thus, a reasonable jury could find that all of the individual plaintiffs suffered severe emotional distress.

## Conclusion

For the foregoing reasons, Defendants' motion, R. 396, is denied. A status hearing is scheduled for August 6, 2008 at which the parties should be prepared to schedule a prompt trial to resolve this case that is more than seven years old.

ENTERED:

*Thomas M Durkin*

Honorable Thomas M. Durkin
United States District Judge

Dated: July 31, 2014